15 minutes for the plaintiff, 15 minutes to be shared by the defendants. Mr. Swanson, would you do that? May it please the Court, Jim Swanson on behalf of the William Beaumont Hospital. I would like to reserve five minutes for rebuttal, please. There are two issues that I wanted to address today. The first one is when did the William Beaumont Hospital's claim accrue under Michigan law? There is a statutory provision, both sides agree that the statutory provision involved is MCL 600.5827, and it says the claim accrues at the time the wrong upon which the claim is based was done, regardless of the time when the damage results. This provision has been construed by the Michigan Supreme Court five times. It's been construed by the Michigan courts consistently five times, and the rule that can be distilled from what the Michigan Supreme Court has said is that wrong for purposes of this statute means harm, and harm means damages. Such that until there is a harm, and until there is damages, there is no accrual of a claim, and the statute of limitations cannot begin to run. That sort of stands to reason when you consider the elements of a claim for fraud. One of the elements of a claim for fraud is damages. So until you have damages, you don't have a claim. That has been consistent. Connolly was the first case that talked about it. Connolly also was the case that discussed this language at the end of the statute, the regardless of the time when the damage results. In Connolly, the court said that regardless language is meant to make it clear that when you have damages that start and continue, you're measuring the accrual from the time they start, not from the time that they continue. So continuing damages do not extend the statute of limitations period. This rule clearly applies in fraud cases. The Boyle case, another Michigan Supreme Court case, says that. It said in footnote 5, the wrong is done when the plaintiff is harmed rather than when the defendant acted. So we would submit to your honors that that rule, that interpretation of the law is very clear under Michigan law and that the district court got that rule wrong when the district court said Michigan law differentiates between harm and damages. That's just plainly a wrong statement of law. The Connolly case and the other cases, Moll, Stevens, Schendorf, and Boyle all affirm that that is the case. He seemed to believe that there's a special rule in fraud cases where the fraud induces a contract that the harm is automatically the execution of the contract and the imposition of the contract itself. The defendants have sought to support the district court's ruling in their briefing in this case and they've cited a number of cases. If you're induced to purchase something that you are fraudulently induced because you're told that, for instance, this gem that I'm selling you is a diamond, and I've defrauded you by telling you it's a diamond, but there's only one gem there, and you enter into a contract and you buy this gem, does it accrue at the time you get the diamond or does it accrue at the time? It accrues at the time you get the diamond. When you get the diamond. Yes, exactly. It accrues at the time you execute the contract in that case because you're damaged immediately. You thought you had a diamond and you don't have a diamond. You don't think you have a diamond and you don't have a diamond, so it's accrued at that time? Yes, it does accrue at the time you get it even if you think you have a diamond because Michigan doesn't use a discovery rule and my colleagues there will point that out and I agree. There is no discovery rule in Michigan. The question is do you have damages or not? The cases that they cite are all cases where, just like in your example, at the time of the execution of the contract, the damages result. A bunch of the cases are mortgage cases, and in those cases the claim was that the plaintiff, as a result of executing the contract, had to pay additional charges and expenses. The nature of fraud before you sell the diamond is when you get the diamond, so if you're still defrauding them, I'm having trouble seeing how all of a sudden the harm has accrued. I'm sorry? The nature of fraud is that you're deceiving someone. Correct. And it makes sense, apart from the cases, it makes sense to say that when the deception is over, that's when it accrues. But you're saying that the deception can continue but it accrues nonetheless. I think that in your... Do you see what I'm asking? I do. Like here we have a fraud, the nature of fraud is that being misled has caused you harm. And that's still going on, even though the contract has been executed. Well, I think there's a separate doctrine of law that covers that situation. And actually that situation applies to a certain extent in our case, because a number of the acts that we contend are fraudulent occurred after the contract was executed. In fact, a big portion of our complaint, paragraphs 80 through 103, that outlined the post, the late 2007 conduct, and the fact that the defendants here understood that the market for ARS was in terrible shape, and they were having meetings at the hospital where they were giving reports on market conditions, all of which is spelled out in paragraphs 100 to 103 of our complaint, that they were misleading us about the state of the market at that time. But the doctrine that applies there is that that is actually a separate and independent fraudulent act. It's a different fraud. Or it is a continuing fraud. You're representing the plaintiff, right? Yes, sir. You're representing the entity that was allegedly defrauded. The hospital. Why is it in your interest to argue an earlier accrual of the statute of limitations rather than a later one? Well, unfortunately, if I've left that impression, I haven't done a very good job of articulating my position. Well, if you say it accrues the instant the contract is entered into, the contract in your case was entered into at a time that would make your claims late, right? Exactly in 2006. I'm not saying that. I'm saying that... And then I'm confused. I am confused. Yeah. What I'm saying, and I apologize for not being very clear about this, is that our claim doesn't accrue until we suffer damages. Right. But on the theory of the diamond, you suffered the damages as soon as you entered into the contract and got a lease or bought securities that were much more untenable than you thought they were. Or I'm using the wrong terminology. Well... You got a deal. You got these auction-related securities. You entered into these... I think it... Borrowed money in a way that was going to have much higher interest than you thought, basically, is what happened, right? Not necessarily, and that's the reason we didn't suffer damages at the time we executed the contract. If you look at the case, the Frank v. Linker case, it is exactly the situation we have in our case. In that case, the situation was the plaintiffs alleged that there was a contract that was entered into as a result of fraud. It was a reorganization contract. And that contract was entered into, but you couldn't tell at the time it was entered into whether it would cause damages or not. You didn't know. Because of the fraud. Not because of the fraud, but because the events hadn't happened that would or would not trigger the damages. And the Frank v. Linker case says the following on that point. What you're saying, the nature of the fraud in this case, is that you were misled as to the nature of these auction... What is it? ARS. Correct. You thought that there was some sort of genuine market out there, and in fact, there was no genuine market out there, is your argument, right? Correct. It's an argument that was artificially maintained by the defendants, right? Correct. So the nature of what you bought was fallacious when you bought it. Sort of like the diamond. Right? The gem wasn't a diamond, and these auction-related securities weren't really auction-related securities. They were some kind of different animal, right? That's correct. So as soon as you bought those things, under your diamond example, it accrued. That's why you're having trouble mis... Well, that's what the Frank case says. It says, in other words, although the defendant's alleged wrongdoing occurred in 2009, plaintiffs had no claim for damages to enforce in 2009 since they had incurred none. At best, their damages were speculative at that time, and plaintiffs cannot maintain claims for speculative damages. And they go on to articulate scenarios in which, although the fraud was committed, there might not be any damages. We have a case that is exactly on point here. It's the LSED case, and in that case, Judge Preska of the Southern District of New York said that, and I'll quote her opinion, that plaintiffs suffered no economic loss prior to the collapse of the ARS market in February 2008. I think your time is up. Thank you. I think I might have been a little lax on that because I was trying to find something in my notebook. Okay. May it please the Court, Joseph Coates representing Morgan Stanley, and I will address the statute of limitations argument, and Mr. Schwartz will address the failure to state a cause of action issues. Your Honor? You're adding your time equally. I intend to use no more than five minutes. The statute of limitations bars this claim because this claim accrued at the point that the contracts were entered into. The essence and the gravamen of this claim was that the plaintiff here below alleged that it was misled, fraudulently induced into entering into contracts to issue the auction rate securities. They allege that they got something they did not bargain for. The wrong, the harm accrued the day that they signed those contracts when they acquired the more risky securities, the riskier securities that they thought that they did not buy. They had a viable cause of action. Fraud, a contract, or does it sound in tort? Fraud sounds in tort, but this is a fraudulent inducement to enter into a contract. They could have rescinded. They had a viable cause of action that day to rescind this transaction, to set it aside. The cases on which they rely are the personal injury cases where the person hasn't. What about a fraud in my example? Let's say you have a painting that you claim is a Monet or a diamond, a gem that you claim is a diamond, right? The fraud could continue from before the time that the contract is entered into on into after the contract. The same fraud could occur, right? Yes. What causes it to accrue? The act of purchasing. Why isn't it the act of inducing him to purchase, which would have been even earlier? Or why wouldn't it be later when they finally discover that this is all untrue? It seemed like the logical place where that would accrue is when the fraud ceased, when the fraudulent activities that misled the defendant. Why is it just at the time that the contract occurs? For purposes of fraud, that seems to be a strange time in which to say that it accrues. Let me address that very quickly, Your Honor. First of all, Michigan law does not have a discovery rule. That's number one. So the fact that when you discover the fraud is inapplicable, the statute itself states that the claim accrues at the point that the wrong occurs. The wrong here was a fraudulent inducement to enter into and issue securities. That's what occurred. That was the wrong. Well, it was securities that aren't secure. I'm sorry. Yes. The fraud is that they're getting you to issue securities that aren't securities in the nature that you said they were. That you believe that they were. Yes. Right. And you took action on that. You took action on that. And then you issued the securities. And also, I cannot overlook the fact that in their complaint, they allege that as a result of issuing those securities, they paid higher broker-dealer fees in the tune of hundreds of thousands of dollars. That wrong occurred from the beginning. And Michigan law is just – I want to ask you something else on this. I'm pretty sure that what you're saying would be right under Tennessee law, for example, unless there were, say, fraudulent concealment of some sort. But I'm having – Michigan law seems a bit murkier on this point to me. And can you tell me where I'm supposed to look in the Michigan case law to know that you were exactly right? Yes, Your Honor. I would ask the court to look to the case of – the cases of Romeo, for example. And also, Your Honor, this court has also applied Michigan law in the context of this very statute, in the context of other fraud cases. For example, a prime example was the Kadahar case versus PNC Bank. And there the allegations were that a plaintiff entered into a mortgage believing that it was a fixed rate, not a variable rate. And the plaintiff entered into the contract in 2004 and the mortgage in 2004. This is a Michigan case? This is a Michigan case, applying Michigan law in this court. Entered into the mortgage – It's not a Michigan State court. It's not a Michigan State court. It's a Sixth Circuit case, applying Michigan law. Can we be looking to Michigan? Sure. Yeah, let's forget what we've said about it. Does the case of Frank versus Slinkner give you any difficulty? No, Your Honor. That case is distinguishable because it's the nature of the wrong as alleged in the Frank case. The Frank case is based on an allegation that there was a subsequent contract that was signed years later that actually harmed the plaintiff. It is not a fraudulent inducement case like we have here. In that case, the wrong occurred from a second contract that was entered into years later. Here, the allegations of this complaint and the gravamen of this complaint is that the plaintiffs allege below that they were harmed at the point that they entered into the ARS. So Frank's language about when the loss occurred is merely a reference to the loss occasioned by the second contract, not a reference to the point at which it became apparent that the plaintiff would have damage from the fraudulent inducement? Correct, Your Honor, and it's important to recall that in that case, the plaintiff below in Frank alleged that he didn't even know that he entered into a contract. So it was not a fraudulent inducement case. Would you characterize Michigan law as entirely clear on this point or not? I do, and every case that discussed a fraud inducement theory, every one of those cases holds that the fraud and the act of entering into the contract is the accrual date for purposes of the statute of limitations. We cited a number of those cases. Respectfully, the appellant cites not a single fraudulent inducement case that holds to the contrary. Does the categorization of fraudulent inducement as a tort make the personal injury cases more analogous than they might seem? No, they don't, Your Honor, because the nature of the personal injury cases, the factual circumstances are abundantly distinguishable. For example, the leading case, the Conley case, and for the court to appreciate what happened in that case, there was a manufacturing printer. I'll wrap it up, Your Honor. Consider brevity in your answer. In that case, a printing press was manufactured in the 1940s. It was then refurbished in 1965. A gentleman was injured in 1967. And the defendants in that case tried to argue that, well, wait a second, the wrong occurred at the manufacturing date of the printing press. And the court said logically, of course, that cannot be the cruel date for purposes of the statute of limitations, because it would, in effect, result in the extinguishment of a claim before it existed. Well, and there was no relationship between the machine and the plaintiff until the plaintiff got hurt. Exactly. And that's the rationale here. The plaintiff was hurt the day that they signed the agreement and they bought and issued securities that were more risky and less valuable than they believed. I think we understand your argument. Thank you. I just want to hear the argument on the other end. Yeah. Good morning, Your Honors. Matthew Schwartz from Sullivan and Cromwell for Goldman Sachs & Co. Your Honors, in addition to the untimeliness of Beaumont's claims, there's an alternate ground for affirmance, which the district court did reach below, which is that Beaumont has failed to state a claim. In their appellate papers, Beaumont takes issue with the district court for not supposedly addressing all three of Beaumont's theories of fraud. This is largely Beaumont's fault. Beaumont represented to the district court that it had but one unified theory of fraud and hardly briefed those other two theories below. Having said that, we don't think that any of their three theories has merit, and this court can just follow this court's previous decision in the Ashland case and the numerous cases that have come out of the Second Circuit and the Southern District on these ARS cases, which almost universally grant motions to dismiss and affirm them. The primary argument that Beaumont made below, which is now buried in the back of their brief, is that the defendants didn't sufficiently warn Beaumont of the risks of auction rate securities and the importance that cover bids played in making that market function. That argument is directly foreclosed by this court's published opinion in the Oppenheimer v. Ashland case, which is 648F3D461 from 2011. Beaumont, very surprisingly in its reply brief, tried to distinguish the Ashland case as dealing only with federal securities claims brought under the PSLRA. That's completely incorrect. That's correct only if you read the first half of the opinion. If you read the second half of the opinion, this court dealt directly with Ashland's claims against Oppenheimer under state law claims for fraud, promissory estoppel, and negligent misrepresentation under Kentucky law, which are obviously very similar in terms of their elements as the claims that Beaumont brings under Michigan law. Are there any ARS cases out there that were successful for the plaintiffs other than cases brought by investors? There are a couple of cases, Your Honor, where the motion to dismiss was denied. Those arose under two specific circumstances. One, for example, in the Merrill Lynch case that counsel for Beaumont cited, where the disclosures, the warning disclosures, weren't given to the purchaser until after the transaction occurred, so the reasonable reliance issue wasn't there. The other circumstance, and we sort of break this down. That's the Merrill Lynch case? Yeah, that's the Merrill Lynch case, and there are other cases. Where is that out of? That's out of the Southern District of New York. Okay, go ahead. And there are other cases, I believe, from the District of Nevada in California and also in the Southern District of New York where there were very specific alleged misstatements in the fall of 2007 and the winter of 2008 where the investor came to the broker-dealer and said, I'm worried about the auction rate securities market. I'm concerned that it's becoming illiquid. What's going on? And the broker-dealer said, no, no, everything is perfectly fine. Those were investor cases? Those were investor cases. Merrill Lynch is an investor case, too, or not? There is one issuer case from Merrill Lynch, and there's also the U.S. Education Fund case out of the Southern District of New York where the court granted the motion to dismiss. It featured both maximum rate claims and failure to warrant claims as well. There they granted the motion to dismiss. So if I'm looking to see what cases outside in the rest of the world, the rest of the nation, with respect to ARS cases, and I'm only looking for issuer cases that go against you or that arguably go in the other direction, we're just talking about Merrill Lynch only? I think that's correct, Your Honor, and I think that you'll note there that it was obviously a very different situation. Counsel for Beaumont seems to think that the investor cases are weaker cases than the issuer cases, and I think it's 180 degrees the other way. In this situation, Beaumont was the issuer. Beaumont in its own official statement disclosed all of its investors, all of the risks that Beaumont claims were now omitted in terms of its conversations with Goldman Sachs and Morgan Stanley. How are investors hurt in these investor cases? How are the investors hurt? I mean, the lack of knowledge causes the interest rates to go up, right? That's correct. In certain of these cases, but not all of them, depending on how the maximum rate was determined, whether it was formulaic or fixed, and also some of these investors were not able to sell their ARS, and so their cash, if they wanted to get cash, would become illiquid, and that was the theory there. So it's the fact that there's a declining market for them, for the securities, that in this case causes the higher interest rates to be paid by the hospital. That's effectively correct, Your Honor. Well, let's keep it. If it's effectively, I think it's good enough in this context. I think that's correct, Your Honor. And, again, that issue, this failure to warn in 2007 and 2008, was also directly dealt with by this Court in the Ashland case. And when dealing with the fraud cases, with fraud claims, this Court looked to the Sienta arguments, and we do make those below here. But more importantly, and I think looking at the negligent misrepresentation and promissory estoppel claims that Ashland brought against Oppenheimer, this Court said, look, you had disclosures that disclosed these exact risks. And in that case, those disclosures were fairly, I would characterize them as weak, compared to the disclosures here. So in that case, this Court cited the following two disclosures, that Oppenheimer is not obligated to submit a bid to prevent an auction failure, and Oppenheimer provides no assurance as to the outcome of any auction. In this case, the disclosures, which came from Beaumont itself, are much more fulsome. They include that each of the broker-dealers also routinely places one or more bids in auctions, generally to prevent a failed auction, or a clearing rate it believes is not a market rate. While they may do so with regard to the 2006 ARS, they are not obligated to do so, and may elect not to do so. And Beaumont attacks this disclosure and it says, well, you only said you may routinely do so. But that's not what this disclosure says. This disclosure says that broker-dealers routinely place these bids. Beaumont is looking to disclosures that were made in other cases in front of the Second Circuit, which, by the way, the Second Circuit found were perfectly sufficient to overcome any kind of reasonable reliance. I don't think Beaumont Hospital or other people borrowing money would enter into these things if they knew it was totally under the control of the people that they were selling them to, that they could just sort of decide one day to have it collapse. I do, Your Honor, for two reasons. First of all, this market had functioned perfectly well for over 20 years, and it was really, as I think a lot of people have acknowledged, the onset of the credit crisis in 2007 and 2008, which disrupted lots of functioning markets across the world that caused the particular problems here. More importantly, what Goldman Sachs and Morgan Stanley were doing was simply acting as market makers, which is very typical throughout almost any type of securities transactional market. And, in fact, until you had the advent of e-trading and high-frequency trading in the stock market, you had market makers there, too, and the stock market wouldn't have functioned without them. When they say we make a market in this security, what does that mean exactly? What that means is that if they need, in order to make the market liquid, if they need to take securities onto their inventories and then find buyers for them later, that's what they'd mean by making a market. And it makes sense here because you have thousands of auctions going on every day. You're not necessarily going to have all the right bidders showing up to all the right auctions. And so you may have auctions where there are bids for only 90 percent or 85 percent or 95 percent of the bonds, and so the broker-dealer will take the remaining balance of those excess bonds onto its market and then look to quickly sell it off in the secondary market. So it doesn't mean there's anything unhealthy. It just means that they're making a market, as you would do with the New York stock market, as you do with the U.S. Treasury's market, as you do with anything else. There's nothing nefarious about this. This is really, you know, we lost money so we're going to sue you type things. And that's what the Southern District and the Second Circuit have almost routinely said. They said this was in plain sight here. I want to very – What's the closest Second Circuit case that supports your position? There is the Ashland case from the Second Circuit. There is the Wilson case from the Second Circuit. Thank you. They've all been cited. And if I could just very quickly sum up in my 10 seconds as to the max rate claim that they have, they haven't come close to satisfying Rule 9B here. The only thing they've said is they had general meetings with Goldman Sachs and Morgan Stanley, a few employees attended, and there was discussion about the max rate. They don't even tell us which defendant, Morgan Stanley or Goldman Sachs, is supposed to have made that. Is my recollection correct that the district court never cited 9B? I think that's correct, Your Honor. I would have to look again. But that's because it didn't reach the scienter issue. It really focused on reasonable reliance, which, again, courts almost universally have found lacking in these situations in dismissing. Thank you for your patience, Your Honor. Thank you, Your Honors. I want to be clear and quick here. In our complaint, we allege in paragraphs 83 through 103, a course of conduct that occurred in late 2007 extending until the market collapsed in February 2008. That was one of our primary thrusts of our case. They are saying that our case accrued before they committed those fraudulent acts, to get to the point that I think you were raising earlier. Now, what the Ashland case said, which is a Sixth Circuit case, Ashland v. Oppenheimer, was that there are cases that have dismissed these claims or allowed these claims to go forward. And in general, the cases that have gone forward are cases where there are specific allegations of wrongdoing in late 2007 and 2008. You need to look at our complaint, paragraphs 83 through 103, and you will see that we made those specific kinds of allegations that have allowed these cases to go forward. Judge Rogers, you asked which cases have allowed the cases to go forward. Well, one is the LACD case, which is similar to this, an issuer case. Louisiana Superdome issued bonds. Another one is the Defer v. Raymond James case. Another one is another Merrill Lynch case that was part of that same MDL. Another one was the People's State Bank case. Another one is the Tudor-Perini case. And another one is the Anschultz case. Those are all cases that are cited in our brief, but they are all cases where the motion to dismiss was denied because the allegations were specific and concrete, just like the allegations that we have now. Is it dropped by issuers? Merrill Lynch, the only two cases, and I could be wrong on this, that I know of, that are issuer cases that were resolved in court. There have been a lot of arbitrations involving issuers. It's Merrill Lynch. Are they issuer cases? No, the only two issuer cases that exist in the world that I know of are the LACD case, the Merrill Lynch case that we've been talking about, and the other case that Mr. Schwartz cited. One of those allowed it to go forward. That was the LACD case, and the other one denied, granted the motion to dismiss. You're calling LACD is what he's calling the Merrill Lynch case? That's what I'm calling it. It's the Louisiana Stadium and Exposition District case, and the reason I cite it that way is because there are many Merrill Lynch cases. Make sure we're talking about the same thing. That was Judge Prescott. These two Second Circuit cases that he's citing. I'm sorry? These two Second Circuit cases that he's citing. They're not issuer cases. Those are investor cases. Those are investor cases, almost. There are many, many investor cases out there, and there are very few issuer cases. Many of the issuer cases were brought in arbitration, but the only two issuer cases are the LACD case, which I would submit is quite similar to this case, and the other student loan case that he was talking about, which is cited in their brief. Now, getting back to the question about the limitations. What are the specific actions that you say you cited? You don't have the page ID for the complaint, do you? I could find it for you, but I don't have it up at the podium. What are the specific things you allege? That's a concern I have. Okay. Beaumont is a big hospital system. They issue bonds all the time. In the period from August 2007 to February 2008, when the ARS market was in trouble, Goldman Sachs, for example, was worried because their inventories were rising, and they had strict inventory limits that they needed to comply with, and they knew that they weren't going to be able to comply with them. As a result of that, they took steps to prepare for the time when the auction rate market would collapse. For example, they disabled their computer system that systematically placed these support bids. Are these allegations of statements that were made to the issuers? Yes. There are specific allegations of statements made and omissions made to Beaumont in paragraphs 100 to 103 of the complaint. There is a series of meetings. They were having what they called market update meetings where they would come to Beaumont or there would be a conference call, and what would happen is they would give a state of the market, and when they gave those state of the markets, they did not say that they were preparing to get out of the market. I'm sorry? They didn't say? They did not say that they were running into inventory problems, that they were very worried that either they or another underwriter, another broker dealer, was going to fail the auctions, and that they had disabled their own computer system and were getting ready and prepared. Do you ever allege that they said something as opposed to they didn't say something? The misrepresentation claim has to do with the maximum rate, and that is paragraphs, I think. So the answer is no? Well, the answer is yes on a different point. With respect to the market updates, they were providing us 100 to 103, that's what you're citing for in there. There's no statements. Those are omissions. Yes, sir. Where are the statements? The statements are paragraphs, I think, 58 through 63. Yeah, 58 through 63, paragraphs 23 and 24. And let me just conclude by saying that, Judge, the district court agreed that we did not suffer damages until February 2008. He plainly says that in his decision. Therefore, if you rule that the statute of limitations issue was wrongly decided, which I think, I submit, you almost have to do, because we're alleging fraud that occurred in 2007 and 2008, which I think completely destroys the underpinnings of the execution of the contract argument, then if you get to these allegations of the misrepresentations, 58 through 63. Okay, thank you very much. We appreciate the argument that all of you have given, and we'll consider the case carefully. Great. Thank you.